**Lillian O. HALE, Plaintiff,**

v.

**CUYAHOGA COUNTY WELFARE DEPARTMENT, Ronald Smith, and Jerome Havericak, Defendants.**

No. C84–705.

United States District Court,
N.D. Ohio, E.D.

Aug. 12, 1988.
Decision Reversed
Dec. 19, 1989.

Edward Geller, Cleveland, Ohio, for plaintiff.

Patrick Murphy, Asst. County Prosecutor, Cleveland, Ohio, for defendants.

## ORDER

BATTISTI, Chief Judge.

### I. BACKGROUND

Plaintiff, Lillian O. Hale, is a black woman who was employed by the Cuyahoga County Welfare Department ("CCWD," a defendant in this case) from 1961 until her retirement in August of 1987. Defendants Havericak and Smith were CCWD administrators who were involved in promoting Edmund Hanna, a white man, to the position of Coordinator, a post for which Mrs. Hale applied.

Mrs. Hale's complaint contains three charges:

(1) That CCWD discriminated against her because of her sex and race and in retaliation for her filing charges with the Equal Employment Opportunity Commission ("EEOC") by not seriously considering her for promotion and promoting Mr. Hanna to Coordinator. Such discrimination would be a violation of Title VII of the Civil Rights Act of 1964. 42 U.S.C.A. § 2000e, et seq. (West 1981).

(2) That CCWD breached the agreement it made with her in settlement of her 1981 EEOC charge by failing to follow its written personnel policies and failing to make the Coordinator's job promotion decision without regard to sex, race, religion, or national origin.

(3) That Mr. Havericak and Mr. Smith deprived her of her fourteenth amendment and Title VII rights under color of state law by discriminating against her on the basis of race and sex and in retaliation for her filing charges with the EEOC. This deprivation would be a violation of § 1983 of the Civil Rights Act of 1871. 42 U.S. C.A. § 1983 (West 1981).

Mrs. Hale seeks damages amounting to the difference between her actual salary and the salary she would have earned as

Coordinator. She also seeks punitive damages against Mr. Havericak and Mr. Smith claiming that their actions were in willful, malicious, and in reckless disregard of her rights.

## II. STIPULATIONS

The parties have stipulated to the following facts and they are taken as true.

These events took place in CCWD's SAU–WIN division. The Administrator is at the peak of that division's organization chart. Directly below the Administrator is the Coordinator, a Social Service Supervisor 2 level position. Directly below the Coordinator is the Assistant Coordinator, a Social Service Supervisor 1 level position. Mr. Hanna was promoted from Assistant Coordinator to Coordinator. Directly below the Assistant Coordinator the division is split into two locations: ongoing services (the location that provides welfare services) and "co-location" (the intake location where those seeking assistance first contact the division). When the events that culminated in this lawsuit began there were four Social Service Supervisor 1's, including Mrs. Hale, supervising social service workers at the ongoing services location. There were two Social Service Supervisor 1's supervising social service workers at the co-location. In late July or early August of 1981 defendant Ronald Smith was promoted from Coordinator to Administrator. Mrs. Hale took it upon herself to apply for the position vacated by Mr. Smith on August 10, 1981. CCWD did not seek applicants because it did not intend to fill the position immediately because of a county-wide hiring freeze. The position was left vacant but Mr. Hanna was temporarily assigned to perform the duties of the position as "Acting" Coordinator.

On September 18, 1981 Mrs. Hale filed charge number 052813280 with the EEOC claiming that she was discriminated against by not being chosen as "Acting" Coordinator. In settling this charge CCWD agreed:

(a) To follow all written personnel policies in filling the position of [Coordinator].

(b) To review all candidates for this position under strict guidelines of Title VII without regard to sex, race, religion, or national origin.

(c) To notify the [EEOC] in writing when and if [the Coordinator] position [was] filled.

(d) To notify all Supervisor 1's in writing of the candidate selected [as Coordinator].

Settlement Agreement, EEOC charge no. 052813280 (Nov. 5, 1981).

On February 24, 1983 the opening for the Coordinator's position was finally posted. The applications were screened for compliance with the minimum qualifications of the position. Ten finalists, including Mrs. Hale and Mr. Hanna, met the requirements for the position and were interviewed by defendants Smith and Havericak. Mr. Hanna was selected to fill the position. The CCWD staff was notified by a March 21, 1983 memorandum.

On April 1, 1983 Mrs. Hale filed another charge with the EEOC (charge number 052831700). She alleged that CCWD discriminated against her in not choosing her as Coordinator. On December 6, 1983 the EEOC determined that there was no reasonable cause to believe that her charge was true and issued a right to sue letter. The EEOC reopened the case when Mrs. Hale questioned its determination. This suit was filed on March 5, 1984 and it was held in abeyance pending a final EEOC determination. On June 19, 1986 the EEOC again determined that there was no cause to believe that Mrs. Hale's charge was true. This case came to trial under the EEOC's right to sue letter.

## III. DIRECTED VERDICT MOTIONS

■ At the close of the plaintiff's evidence the defendants moved for a directed verdict because the plaintiff failed to present a prima facie case of discrimination.[1] The defendants claimed a prima fa-

---

1. In a Title VII case the complainant has the initial burden of establishing a prima facie case of racial discrimination. This may be done by showing:

cie case was not established because after Mrs. Hale's rejection the position did not remain open and CCWD did not continue to seek applicants (thus the fourth element of the *McDonnell Douglas* test was not met). This motion was denied because *McDonnell Douglas'* prima facie test was specific to the facts of the case.[2] That a position must remain open and the employer continue to seek applicants is not required to establish a prima facie case when the plaintiff specifically claims that the employer violated the civil rights laws by hiring someone instead of her.

■ At the close of all of the evidence the defendants again moved for a directed verdict. This time they claimed that the plaintiff did not make out a prima facie case because the person chosen for the job was a member of a protected class in that he was over forty years old. This motion was denied. The civil rights laws require that employment decisions be based on racially and sexually neutral criteria. *McDonnell Douglas*, 411 U.S. at 801, 93 S.Ct. at 1823. Employers may not discriminate against one protected group by making sure that a member of another protected group benefits. "Discriminatory preference for any group ... is precisely ... what Congress has proscribed." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971).

At the close of the evidence a verdict was directed for the defendants on the issue of race discrimination. Viewing the evidence in a light most favorable to Mrs. Hale reasonable people could reach but one conclusion, that the defendants were not motivated by an intent to discriminate against her on the basis of her race.

Also a verdict was directed for the defendants on part of the contract claim. There was no evidence of CCWD's failure to follow their written EEOC guidelines or failing to make their promotion decision without regard to religion and national origin. A verdict was directed for CCWD on these issues.

After the elimination of the race discrimination and several contract issues plaintiff's counsel withdrew the claims that were to be tried to the jury. What remains is a Title VII claim that CCWD discriminated against Mrs. Hale on the basis of her sex and in retaliation for her 1981 EEOC charges by not seriously considering her for promotion and by promoting Mr. Hanna to the position for which she applied. These issues are tried to the Court.

## IV. FINDINGS OF FACT

1. Mrs. Hale had been a CCWD supervisor for seventeen years prior to her 1983 application for the Coordinator's position.

2. Mr. Hanna had been an office manager in a real estate firm before coming to CCWD.

3. Mrs. Hale's performance evaluations were always excellent, even for "willingness to cooperate" in 1982 and 1983 after her EEOC complaint. These later evaluations were made by Mr. Hanna.

4. Mrs. Hale had significant experience with the provision of welfare services to clients.

5. Mrs. Hale was well versed in government regulations.

6. Mrs. Hale was respected and well liked by her co-workers. They went to her with their problems.

7. Mrs. Hale was an innovative problem solver.

8. Mrs. Hale was actively involved in the administration of the ongoing services location including recommending needed changes and presiding over meetings.

---

(i) that [s]he belongs to a racial minority; (ii) that [s]he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite [her] qualifications, [s]he was rejected; and (iv) that, after [her] rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

**2.** "The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations." *Id.* at 802 n. 13, 93 S.Ct. at 1824 n. 13.

9. Mrs. Hale was considered by Mr. Smith to be a good worker and a good employee.

10. In the intake co-location Mr. Hanna had more interaction with people in outside agencies than Mrs. Hale had in the service provision location.

11. Mr. Hanna was a good liason between CCWD and other agencies.

12. When Mr. Smith would leave the office (which was not very often) Mr. Hanna would be in charge.

13. Mr. Smith enjoyed working with Mr. Hanna.

14. The position of Assistant Coordinator was created for Mr. Hanna to allow him to gain supervisory experience to overcome the disadvantage that his lack of a college degree may have become to his advancing within the department.

15. Mr. Hanna was chosen as Assistant Coordinator in 1974. He was selected over a woman who was, at the time, deemed less desirable because she was "aggressive."

16. Although Mrs. Hale was not considered for Coordinator in 1981 because there was a prepared list, Mr. Hanna was asked to be "Acting" Coordinator in spite of any list or hiring freeze.

17. Mrs. Hale was not considered for "Acting" Coordinator.

18. Mr. Hanna was chosen as "Acting" Coordinator in 1981 but a job opening was not advertised or posted.

19. Mr. Hanna was chosen as "Acting" Coordinator because of his advantageous position as Assistant Coordinator. This situation was created by the defendants because they liked working with him, thought he was a good supervisor, and thought he interacted well with those in other agencies.

20. Mr. Smith believed Mr. Hanna did a good job as "Acting" Coordinator.

21. The "Acting" Coordinator received no extra pay.

22.. Any claim for relief Mrs. Hale may have had concerning the 1981 decision to make Mr. Hanna "Acting" Coordinator was settled by the EEOC settlement.

23. It was CCWD policy that those who would supervise a new employee or promotee were to conduct selection interviews and recommend candidates.

24. All of the finalists for the Coordinator's job were asked the same prepared questions at the promotion interview.

25. Mrs. Hale began working for CCWD in 1961. At the time of the promotion decision in 1983 she had been with CCWD for twenty-two years.

26. Mr. Hanna started with CCWD in 1970. At the time of the promotion decision he had been with CCWD for thirteen years.

27. The seniorities of the eight other candidates were five at sixteen years, two at twelve years, two at eleven years, one at seven years, and one at six years.

28. Mrs. Hale has a bachelor's degree in communications.

29. Mr. Hanna had two years of college toward a degree in biology.

30. Of the eight other finalists for the Coordinator's job four had master's degrees in social work, one had an associate of arts degree, and three had bachelor's degrees.

31. Three of the ten finalists for the Coordinator's position were white men with master's degrees. One was a black female with a master's degree.

32. Three of the top four final candidates were women.

33. Mrs. Hale was not among the top four candidates.

34. The higher management position of Coordinator required management, supervisory, and interaction skills over a technical familiarity and facility with services provision.

35. In 1981 seventy-eight percent of CCWD's employees were women and sixty-three percent of the officials and managers were women.

36. In 1983 eighty percent of CCWD's employees were women and sixty-four percent of the officials and managers were women.

37. In 1981 fifty-two percent of CCWD's employees were black women and thirty-four percent of the officials and managers were black women.

38. In 1983 fifty-six percent of CCWD's employees were black women and thirty-seven percent of the officials and managers were black women.

39. In 1981 fifty-eight percent of the CCWD's employees were black and forty-three percent of the officials and managers were black.

40. In 1983 sixty-two percent of the CCWD's employees were black and forty-six percent of the officials and managers were black.

41. Although four of five first line supervisors (Social Service Supervisor 1) in the SAU–WIN division were women, the top three administrative positions were held by men.

42. Mr. Havericak and Mr. Smith knew that Mrs. Hale had filed the discrimination charge with the EEOC in 1981.

43. From April 21, 1983 until her retirement on August 1, 1987 Mrs. Hale earned $127,376.50 and Mr. Hanna earned $142,-383.55. The difference is $15,007.05 (see Appendix).

### V. CONCLUSIONS OF LAW

Mrs. Hale claims that CCWD did not seriously consider her for promotion to Coordinator and promoted Mr. Hanna to Coordinator because of her race, her sex, and in retaliation for her filing charges with the EEOC in 1981. If these charges are true CCWD would be in violation of Title VII of the Civil Rights Act of 1964—specifically § 703(a) which makes it an

unlawful employment practice to … discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race [or] sex …; or … to limit, segregate, or classify … employees … in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect [her] status

as an employee, because of such individual's … race … or sex.…

42 U.S.C.A. § 2000e–2(a) (West 1981). CCWD would also be in violation of § 704(a) which makes it an "unlawful employment practice … to discriminate against any … employe[e] … because [she] has made a charge [that she was discriminated against]." 42 U.S.C.A. § 2000e–3(a) (West 1981).

In adjudicating a Title VII claim the court must be ever mindful of the strong national policy of achieving "equality of employment opportunities and [eliminating] those discriminatory practices and devices which have fostered racially [and sexually] stratified job environments to the disadvantage of minority [and female] citizens." *McDonnell Douglas,* 411 U.S. at 800, 93 S.Ct. at 1823. Employment decisions must be based on racially and sexually neutral criteria. *Id.* at 801, 93 S.Ct. at 1823. "Title VII tolerates no … discrimination, subtle or otherwise." *Id.*

However, the court does not sit to determine which candidate should have been chosen for promotion or to second guess the employer's decision. *Cooper v. City of North Olmsted,* 795 F.2d 1265, 1271–72 (6th Cir.1986). Rather the court is to examine the motivations behind an employment decision and ferret out those that are impermissible. *Id.* at 1272. The court is to determine if an employer intentionally discriminated against an employee. "Because discriminatory intent is so difficult to prove by direct evidence, it is incumbent on a sensitive [trier of fact] to analyze all of the surrounding facts and circumstances to see if discriminatory intent can be reasonably inferred." *Grano v. Department of Dev., City of Columbus,* 637 F.2d 1073, 1081 n. 7 (6th Cir.1980).

Mrs. Hale claims that she was sexually and racially discriminated against and discriminated against in retaliation for her filing her EEOC claim. This is a claim of disparate treatment. *Id.* at 1081. The Supreme Court has established a procedure for analyzing disparate treatment cases. First, the plaintiff must establish a prima facie case. The first element of a prima

facie case is the plaintiff must show that she was a member of a protected class or engaged in protected activity. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. Mrs. Hale is a black woman who filed an EEOC charge. The second element of a prima facie case is that the plaintiff must show that a white man who did not file a charge received dissimilar treatment. *Cooper*, 795 F.2d at 1270. Mr. Hanna was promoted to Coordinator and Mrs. Hale was not.

Mrs. Hale also alleges that she did not receive serious consideration for promotion to Coordinator because of her race, sex, and in retaliation for her EEOC charge. To make out her prima facie case for this charge she would have to show at least inferentially by a preponderance of the evidence that Mr. Hanna was given more serious consideration than her for the position of Coordinator. The evidence that Mrs. Hale was given less serious consideration than Mr. Hanna is that Mr. Smith and Mr. Havericak had over the years positioned Mr. Hanna as "Acting" Coordinator where they could observe his performance in anticipation of the permanent selection. They also enjoyed working with him. Finally, in spite of her qualifications, Mrs. Hale was not within the top four finalists for the Coordinator's position.

The defendants counter this evidence by claiming that the selection was based on neutral criteria and that neutral procedures were used. The opening was posted. The personnel office screened the applications. All of the applicants were asked the same questions. However, these neutral procedures do not overcome the inference that arises from the evidence of Mr. Smith and Mr. Havericak's predilection for Mr. Hanna. The Court finds that Mr. Hanna received treatment dissimilar from that given Mrs. Hale in that he was given more serious consideration for the Coordinator's job.

The third part of establishing a prima facie case is that the plaintiff must present sufficient evidence from which a causal connection can be inferred between her sex, race, or the filing of the EEOC charges and the disparate treatment she received—here the promotion of Mr. Hanna and the failure of CCWD to consider her as seriously as it did Mr. Hanna. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).[3] Mrs. Hale must present evidence from which it may be inferred that she was not chosen or not seriously considered for the Coordinator's job because of her race or sex or in retaliation for her filing her EEOC charges.

Each of Mrs. Hale's claims will now be analyzed. First it will be determined whether she has established a prima facie case for each of her claims. All that remains is the third element, whether a causal connection can be inferred between her treatment and her sex, race, or filing her EEOC claim. Then it will be determined if she has proven that she was the victim of intentional discrimination or retaliation. Before this analysis other procedural matters will be resolved.

After the plaintiff establishes a prima facie case the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for" its employment action. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. The defendants here have done so. They claim that Mr. Hanna was promoted and given more serious consideration than Mrs. Hale because he had better supervisory skills and experience interacting with other agencies in the intake location and as Assistant and "Acting" Coordinator.

After the defendants articulate a nondiscriminatory reason for their actions Mrs. Hale's burden remains "to prove by a preponderance of the evidence that the defendants intentionally discriminated against her." *Grano*, 637 F.2d at 1081. One way to meet this burden is by proving "that defendant's asserted motive is pretextual." *Cooper*, 795 F.2d at 1271. That is, that the

---

**3.** The burden of establishing a prima facie case of disparate treatment is not onerous. The plaintiff must prove by a preponderance of the evidence that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093.

defendants' alleged motivation was actually put forth to conceal their true motive which was either sex or race discrimination or to retaliate against Mrs. Hale for bringing charges.[4] "The need to prove pretext merges with the plaintiff's ultimate burden of persuading the court that she was the victim of intentional discrimination, a burden that [she] retains at all times." *Cooper*, 795 F.2d at 1271.

Mrs. Hale must prove that she was not promoted or seriously considered for promotion because she is black or because she is a woman or because she filed EEOC charges. Because the defendants have articulated legitimate nondiscriminatory reasons for their action she may proceed either directly, by proving that she was not promoted or seriously considered either because of her race, sex, or in retaliation, *or* she may prove that the defendants' proffered reasons were not their true reasons and, therefore, the actual reasons were because she is black, or a woman, or because she filed her charges.

### A. Race Discrimination

■ To establish her prima facie case Mrs. Hale must present evidence by which it can be inferred that CCWD promoted Mr. Hanna and not Mrs. Hale and did not seriously consider Mrs. Hale for the job because of her race.

Mrs. Hale has established that she is black and that Mr. Hanna is white but no evidence has been presented from which it can be inferred that Mrs. Hale was not considered seriously or was not promoted because of her race. Mr. Smith, who is black, indicated no prejudice toward black people and Mrs. Hale's witnesses suggested none. Because Mrs. Hale has failed to make out a prima facie case of race discrimination the Court finds for the defendants on this issue.

### B. Sex Discrimination

#### 1. The Prima Facie Case.

■ To establish a prima facie case of sex discrimination Mrs. Hale must present

evidence that would support the inference that she was not promoted and not seriously considered for promotion because she is a woman.

The evidence has shown that Mr. Smith enjoyed working with Mr. Hanna and that he positioned Mr. Hanna for favorable consideration for the job of Coordinator. For Mrs. Hale to make out her prima facie case there must be evidence to support the inference that Mr. Hanna arrived at this preferred status and position because he is a man and Mrs. Hale did not because she is a woman.

The evidence supports the inference of a chummy fraternal relationship existing in upper management levels at CCWD and between Mr. Smith and Mr. Hanna. By definition, women may not enjoy chummy fraternal relationships. It could be inferred that this relationship caused the defendants to hire Mr. Hanna and to not seriously consider Mrs. Hale. If this relationship caused the defendants to favor Mr. Hanna over women it runs afoul of Title VII. It is this "[d]iscriminatory *preference* ... [that] Congress has proscribed." *Griggs*, 401 U.S. at 431, 91 S.Ct. at 853 (emphasis added). "Title VII tolerates no ... discrimination, subtle or otherwise." *McDonnell Douglas*, 411 U.S. at 801, 93 S.Ct. at 1823. Mrs. Hale has established a prima facie case of sex discrimination.

#### 2. Plaintiff's Ultimate Burden of Proof.

Mrs. Hale has established her prima facie case. The defendants have articulated legitimate, nondiscriminatory reasons for their decisions. Mrs. Hale must now meet her ultimate burden of proving that she was not hired or not seriously considered for the job because of her sex. She may do this directly or by proving that the employer's proffered reasons are pretext. To prove pretext she must prove either (1) "that a discriminatory reason more likely motivated the employer or ... [ (2) ] that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at

---

**4.** "This is what pretext means: a reason for the employment decision that is not the true rea-

son." *Bibbs v. Block,* 778 F.2d 1318, 1321 (8th Cir.1985) (emphasis in original removed).

256, 101 S.Ct. at 1095. *Burdine's* first "method" of proving pretext is merely the plaintiff's usual burden in a discrimination suit—to show that the defendants intentionally discriminated against her. *See Cooper,* 795 F.2d at 1271.

The second method is by proving that the defendants' proferred reasons lack a factual basis. *Burdine,* 450 U.S. at 258, 101 S.Ct. at 1096. That is, that the defendants are not telling the truth. The proferred reasons were not the real reasons for the defendants' acting as they did—they acted as they did because Mrs. Hale is a woman.

There are several ways to express what Mrs. Hale must prove: (1) that sex *made a difference* in the defendants' decision to promote Mr. Hanna rather than Mrs. Hale or to not seriously consider her for the job; or (2) that *but for* Mrs. Hale's sex she would have been promoted or seriously considered for the job (that is, she would have been promoted or seriously considered if she were a man); or (3) that sex *played a part* and was a *determining factor* in these two employment decisions. *Cuddy v. Carmen,* 694 F.2d 853, 858 n. 23 (D.C.Cir. 1982). However, "if reasonable and lawful factors dictate and support the employer's decision, additional consciousness of [sex] is not itself interdicted by the Act." *Id.* at 858 n. 23.

Specifically the question to be answered is, "Did the defendants choose Mr. Hanna as Assistant in 1974, as 'Acting' Coordinator in 1981, and as Coordinator in 1983 because he is a *man* and, thereby, not consider Mrs. Hale because she is not?" These events are interconnected because as one occurred the path was prepared for the subsequent events—one led to the others. Another way to phrase the question is, "Did the defendant decision makers enjoy working with Mr. Hanna and decide to grease the wheels for him because he is a man *or* for the reasons they proffer in this case—that he had good supervisory skills and interacted well with other agencies?"

### 3. Analysis of the Facts.

▮ CCWD did not choose a woman in 1974 because she was considered too ag-

gressive. From this evidence the inference can be made that the events unfolded in Mr. Hanna's favor because he is a man. Often men who prefer women to be submissive will characterize women who stand up for themselves, forcefully assert their opinions, and insist that their rights be respected as "too aggressive." Often men who prefer women to be submissive will not accept women into management positions as equals. These men will not promote women just because they are women.

Other evidence supporting the inference that CCWD had discriminatory motives is that, although five of six first line supervisors in the SAU–WIN division were women, all of the administrators were men. The administration was an all male, three position column. There were women qualified to be managers because all of the finalists for the Coordinator's job were qualified for the job and four of the ten were women.

Mr. Hanna was also chosen over Mrs. Hale even though Mrs. Hale had a college degree and Mr. Hanna did not. Because the job did not require a degree this fact should be cautiously assessed. "[D]iplomas and degrees [are not] fixed measures of capability." *Griggs,* 401 U.S. at 433, 91 S.Ct. at 854. However, the decision makers could have adjusted the job's requirements to accommodate Mr. Hanna. Also, even though it is not dispositive because a college degree is not required it is reasonable for decision makers to consider whether a candidate for a management position has a college degree. In this respect Mrs. Hale was a more attractive candidate than Mr. Hanna. Another factor tending to discount the probative value of the differences between the educations of Mr. Hanna and Mrs. Hale and downplay the significance of Mr. Hanna's lack of a degree is that Mr. Hanna was chosen over men with masters' degrees in social work.

The ultimate question is whether the inferences that may be drawn from the evidence (that Mr. Hanna's path to Coordinator was made smooth because he is a man and that Mrs. Hale was not seriously considered or chosen for the position because

she is a woman) overcomes the defendants' preferred reasons for these decisions. Again, the evidence is: (1) In 1974 a woman was unfavorably considered because she was aggressive, (2) five of six front line supervisors were women and all of upper management were men, and (3) a man who had been with the agency thirteen years was chosen over a woman who had twenty year's experience (seventeen of which as a supervisor), a better education, outstanding performance reviews, and the respect of her subordinates, peers, and supervisors. This evidence must overcome the defendants' self-serving but unrefuted testimony that Mr. Hanna was a better supervisor and had experience and aptitude interacting with other agencies as required in the Coordinator's position.

The Court finds that the inferences that Mrs. Hale was not seriously considered and not promoted because she is a woman overpower the defendants' preferred reasons. CCWD more likely did not promote Mrs. Hale and did not seriously consider her for the job because she is a woman. This is a violation of Title VII of the Civil Right Act of 1964 and Mrs. Hale is entitled to recover her damages.

### C.  Retaliation

■ To establish a prima facie case of retaliation Mrs. Hale "must establish: (1) that [s]he engaged in activity protected by Title VII; (2) that [s]he was the subject of adverse employment action; and (3) that there exists a causal link between [her] protected activity and the adverse action of [her] employer." *Jackson v. RKO Bottlers of Toledo, Inc.*, 743 F.2d 370, 375 (6th Cir. 1984). That is, Mrs. Hale must present evidence from which it can be inferred that she was not promoted to Coordinator and not seriously considered for the promotion because she filed her EEOC charge in 1981. *Id.* at 377.

There is no dispute that Mrs. Hale filed the charge and that the decision makers knew it. Those making the promotion decision were the very people against whom Mrs. Hale filed her charge. Her other evidence of retaliation is the same as that

offered for her charge of sex discrimination: that she was not promoted and not seriously considered even though she had twenty years experience, a college degree, the respect of her subordinates, peers, and supervisors, and excellent employment evaluations. This is certainly enough to support the inference that she was not seriously considered for the Coordinator's job in 1983 and not ultimately promoted in retaliation for her filing her EEOC claim in 1981. She has, therefore, established a prima facie case.

■ CCWD claims that it hired Mr. Hanna because of his superior supervisory skills and his ability to interact and his experience interacting with other agencies. Mrs. Hale must now prove that CCWD was more likely motivated by an intent to retaliate or that CCWD's proffered reasons are not to be believed—that they are merely pretext. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

The picture that emerges from the evidence is, again, of a fraternal camaraderie between the promoting decision makers and Mr. Hanna. This relationship began back in 1974. From that point forward Mr. Hanna was given preferential treatment because the decision makers liked working with him and felt he did a good job. They created the position of Assistant Coordinator to allow him to get the supervisory experience he would need to overcome his lack of a college degree which could have been a disadvantage in his attempts to advance at CCWD. When the Coordinator's job became vacant Mr. Hanna was shuffled into the position of "Acting" Coordinator without seriously considering any other candidates, including Mrs. Hale who immediately expressed an interest in taking on the added responsibilities.

It was after all this that Mrs. Hale filed her EEOC complaint and it is from this point forward that evidence of retaliation must be garnered.

"[P]roof of causal connection can be established indirectly by showing that protected activity is followed by discriminatory treatment." *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir.1980). It is

true that in spite of her qualifications Mrs. Hale was not promoted and not seriously considered for promotion after she filed her complaint. However, the die was cast for Mr. Hanna's promotion before she filed her complaint. After her complaint Mrs. Hale continued to get good performance evaluations (including good marks for cooperation). There is no evidence that her relationship with the promotion decision makers changed after she filed her complaint.

Again, Mrs. Hale must prove that her filing the EEOC claim *made a difference* in CCWD's decision to promote Mr. Hanna and to not seriously consider her for the job. That *"but for"* her charge she would have been promoted or seriously considered. The picture that emerges, however, is that the die was cast before she filed her complaint. She has not proved that had she not filed her complaint she would have been seriously considered or promoted. The Court finds for the defendants on the charge of retaliation for bringing EEOC charges.

## VI. DAMAGES

"If the court finds that [a defendant] has intentionally engaged in ... an unlawful employment practice ... the court may ... order ... any ... equitable relief as the court deems appropriate." 42 U.S.C.A. § 2000e–5(g) (West 1981). In fashioning a remedy "[t]he injured party is to be placed, as near as may be, in the situation [s]he would have occupied if the wrong had not been committed." *Wicker v. Hoppock,* 73 U.S. (6 Wall.) 94, 99, 18 L.Ed. 752 (1867) *quoted in, Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418–19, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975). The plaintiff is to be "made whole." *Albemarle Paper,* 422 U.S. at 418, 95 S.Ct. at 2372.

Mrs. Hale has proven that but for her sex she would have been seriously considered for the Coordinator's job and would have been promoted to that position. She is entitled to the difference in pay between what she earned and what she would have earned had she been Coordinator (it is assumed that the benefits associated with both positions are comparable), plus interest to the day of judgment,[5] plus interest until payment calculated pursuant to 28 U.S.C.A. § 1961(a) (West Supp.1988), plus an adjustment of her retirement benefits to the level they would have been had she been earning the Coordinator's salary since April 1, 1983. Mrs. Hale is also entitled to be reimbursed for reasonable attorney's fees.

CCWD will pay Mrs. Hale $20,123.96[6] plus interest from June 30, 1988 until the judgment date at the rate "charged or paid by the IRS on underpayments or overpayments of taxes...." *Green,* 640 F.Supp. at 1550. CCWD will pay interest on that figure at the rate specified in 28 U.S.C.A. § 1961(a) from the date of judgment until the day the check is delivered to Mrs. Hale. Also, CCWD is to adjust Mrs. Hale's retirement benefits to the level they would have been had she earned what Mr. Hanna earned from April 2, 1983 until her retirement. CCWD must also pay her the difference between the new level of retirement benefits and what she has received in retirement benefits until the adjustment is made, plus interest at the rates specified above.

CCWD is also to reimburse Mrs. Hale for reasonable attorney's fees and the costs she incurred in bringing this action.

IT IS SO ORDERED.

---

5. The interest rate will be that "charged or paid by the IRS on underpayments or overpayments of taxes" as calculated under 26 U.S.C. § 6621. *Green v. United States Steel Corp.,* 640 F.Supp. 1521, 1550 (E.D.Pa.1986) (see Appendix).

6. This is back pay plus interest until *June 30,* 1988 (see Appendix).

APPENDIX

Damages Calculations—Through June 30, 1988

| QUARTER ENDING | HANNA'S 1 EARNINGS | HALE'S 1 EARNINGS | DIFFERENCE 1 | CUMULATIVE TOTAL FORWARD | INTEREST 2 RATE | INTEREST | CUMULATIVE TOTAL |
|---|---|---|---|---|---|---|---|
| 6/30/88 | 8956.00 | 8583.47 | 372.53 | 0 | 16 % | 14.90 | 387.43 |
| 9/30/83 | ″ | ″ | ″ | 387.43 | 11 ″ | 20.90 | 780.86 |
| 12/31/83 | ″ | ″ | ″ | 780.86 | 11 ″ | 31.72 | 1185.11 |
| 3/31/84 | 7651.80 | 6702.20 | 949.60 | 1185.11 | 11 ″ | 58.70 | 2193.41 |
| 6/30/84 | ″ | ″ | ″ | 2193.41 | 11 ″ | 86.43 | 3229.44 |
| 9/30/84 | ″ | ″ | ″ | 3229.44 | 11 ″ | 114.92 | 4293.96 |
| 12/31/84 | ″ | ″ | ″ | 4293.96 | 11 ″ | 144.20 | 5387.76 |
| 3/31/85 | 7924.10 | 6982.65 | 941.45 | 5387.76 | 13 ″ | 205.70 | 6534.91 |
| 6/30/85 | ″ | ″ | ″ | 6534.91 | 13 ″ | 242.98 | 7719.34 |
| 9/30/85 | ″ | ″ | ″ | 7719.34 | 11 ″ | 238.17 | 8898.96 |
| 12/31/85 | ″ | ″ | ″ | 8898.96 | 11 ″ | 270.61 | 10,111.02 |
| 3/31/86 | 8214.40 | 7244.88 | 969.52 | 10,111.02 | 10 ″ | 277.01 | 11,357.55 |
| 6/30/86 | ″ | ″ | ″ | 11,357.55 | 10 ″ | 308.18 | 12,635.25 |
| 9/30/86 | ″ | ″ | ″ | 12,635.25 | 9 ″ | 306.11 | 13,910.88 |
| 12/31/86 | ″ | ″ | ″ | 13,910.88 | 9 ″ | 334.81 | 15,215.21 |
| 3/31/87 | 6784.80 | 5969.07 | 815.73 | 15,215.21 | 9 ″ | 360.70 | 16,391.64 |
| 6/30/87 | ″ | ″ | ″ | 16,391.64 | 9 ″ | 387.17 | 17,594.54 |
| 9/30/87 | | | | 17,594.54 | 9 ″ | 414.23 | 18,824.50 |
| 12/31/87 | — | — | — | 18,824.50 | 9 ″ | 423.55 | 19,248.05 |
| 3/31/88 | — | — | — | 19,248.05 | 9 ″ | 433.08 | 19,681.13 |
| 6/30/88 | — | — | — | 19,681.13 | 9 ″ | 442.82 | 20,123.96 |
| TOTAL | 142,383.55 | 127,376.50 | 15,007.05 | | | | 20,123.96 |

Notes
1. Yearly totals (from CCWD's payroll records) divided by 4 for quarterly totals. It is approximated that yearly totals were earned equally throughout the year.
2. Rate is that "charged or paid by the IRS on underpayments or overpayments of taxes" as calculated under 26 USC § 6621. *Green,* 640 F.Supp. at 1550.